# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1107V
UNPUBLISHED

| | |
|---|---|
| SANDRA BOYD,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br>Filed: August 12, 2021<br><br>Special Processing Unit (SPU); Site of Administration; Onset; Entitlement; Ruling on the Record; Decision Without a Hearing; Influenza (Flu); Shoulder Injury Related to Vaccine Administration (SIRVA); Damages; Pain and Suffering. |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Adriana Ruth Teitel*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT AND DECISION ON DAMAGES[1]

On July 30, 2019, Sandra Boyd filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a right shoulder injury related to vaccine administration ("SIRVA") causally related to her receipt of an influenza ("flu") vaccine on October 24, 2018. *See* Petition at Preamble; ¶¶ 3, 12. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, I find that Petitioner is entitled to compensation, and I award **$81,064.82 in total damages.**

I. **Relevant Procedural History**

After initiating her claim, Petitioner filed supporting medical records and a Statement of Completion. During the September 11, 2019, initial status conference, it was noted that neither Respondent nor his client had yet reviewed the claim. ECF No. 11. Shortly thereafter, Petitioner filed her primary care provider's telephone log records as her Exhibit 9. On November 12, 2019, Respondent's counsel completed an initial review and requested additional evidence which Petitioner filed as Exhibits 10-12 on February 11, 2020.[3]

In light of Respondent's delay to complete a formal review of the case, I directed Respondent to file a more detailed assessment of the claim. On September 24, 2020, Respondent did so, but raised only that the vaccine administration record "does not clearly identify the site of administration, as it contains a superimposed L and R." ECF No. 22 (citing Ex. 1 at 1; Ex. 12 at 2). On October 7, 2020, I provided my tentative view that the vaccination was administered in Petitioner's right arm, and I directed Petitioner to convey a demand, ECF No. 23, which she did on November 11, 2020, ECF No. 24.

On December 9, 2020, Respondent completed his formal review and opposed both compensation and any discussion of settlement. ECF No. 27. Respondent formally disputed that the vaccination was administered in Petitioner's right arm. *Id.* (citing also Ex. 12 at 2). On January 19, 2021, I directed the parties to file any briefing and additional evidence necessary for my issuance of a fact ruling resolving the site of vaccine administration. ECF No. 28. On February 18, 2021, Petitioner instead filed a combined brief in support of entitlement and damages, specifically requesting $95,000.00 for past pain and suffering and $1,064.82 for unreimbursed medical expenses. Mot. (ECF No. 29).

On May 4, 2021, Respondent filed his report pursuant to Vaccine Rule 4(c) plus a responsive brief, arguing that neither vaccine administration situs nor onset within 48 hours could be established. Rule 4(c) Report (ECF No. 31); Opposition Brief (ECF No. 32). Respondent further averred that in the event that Petitioner was found entitled to compensation, the record supported only $65,000.00 for past pain and suffering and

---

[3] Petitioner also filed updated primary care records as her Exhibit 13 on November 25, 2020, and updated orthopedic records as Exhibit 14 on March 11, 2021.

$1,039.82 for past expenses, ECF No. 32 at 4-11. On May 14, 2021, Petitioner filed her reply. Pet. Reply (ECF No. 33). This matter is now ripe for adjudication.[4]

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[5] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

---

[4] Petitioner initially requested oral argument at the earliest possible Motions Day, but upon review of Respondent's response, she acquiesced to resolution on the papers if that would be more expeditious.

[5] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XII)(A). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> *Shoulder injury related to vaccine administration (SIRVA).* SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## B. Relevant Factual Evidence

At the relevant time, Petitioner was nearly 62 years old, and had no history of recent shoulder pain. Ex. 3 at 29-41. She did have diabetes mellitus treated with Metformin. *Id.* at 29-30. She was working as an instructional assistant for students with

autism for the Ojai Unified School District in California. Ex. 6 at 7. She earned additional income by typing medical charts for a local doctor. Ex. 2 at ¶¶ 32-33.

On October 24, 2018, Petitioner received the flu vaccine at issue at a Costco pharmacy after-hours clinic offered through her school district. Ex. 2 at ¶ 4. Petitioner has filed three copies of the same vaccination consent/ administration record. *See* Ex. 1 at 1; Ex. 10; Ex. 12. The most legible (and likely the most complete) is the white administrative copy, which includes both handwritten information and a preprinted sticker:



Ex. 12. As captured above, in the "site of injection" field, the letters R and L seem to be superimposed. *Id.* The preprinted sticker, however, states "left arm." *Id.*

On October 29, 2018, Petitioner presented to her primary care practice for an eight to ten-day history of urinary urgency, frequency, and left lower quadrant pain. Ex. 3 at 25. A doctor assessed a urinary tract infection and prescribed amoxicillin. *Id.* at 28. The record listed the recent flu vaccine in the immunization history section, but no complaints or findings pertaining to the left shoulder. The musculoskeletal exam states only: "Normal gait." *Id.*

On November 4, 2018, Petitioner was cleaning her attic when a foreign body got into her left eye. Ex. 3 at 21. After repeated irrigation, her eye still felt irritated. *Id.* She presented that same day to her primary care practice, where a different doctor assessed corneal abrasion, which was treated with erythromycin ointment and an eye patch. *Id.* at 23. This record does not mention the left shoulder.

Nineteen (19) days post-vaccination, on November 12, 2018, Petitioner telephoned her primary care practice to report "receiving a flu shot at work on 10/24/18 and her arm was immediately sore and bruised, loss of force of her arm…" Ex. 9 at 2. A

5

third doctor advised that neither ice nor heat would help; Petitioner should "mov[e] her arm around" and resume normal activity to "circulat[e] the blood." *Id.*

Thirty-six (36) days post-vaccination, on November 29, 2018, Petitioner returned to the primary care practice. Ex. 3 at 16-20. A nurse practitioner recorded Petitioner's history that since "receiving a flu shot on 10/24/18," Petitioner had been experiencing "very painful," "moderate to severe" pain in the right deltoid area and upper arm, as well as limited range of motion. *Id.* at 16. The nurse practitioner documented tenderness at the right shoulder bicipital groove, deltoid, and scapula. *Id.* at 19. Forward flexion, extension, internal rotation, and abduction were all painful. *Id.* Flexion, internal rotation, and abduction were also weak. *Id.* Only abduction was restricted. *Id.* The nurse practitioner assessed "possible vaccine inducted bursitis?" *Id.* She prescribed Voltaren gel, *Id.* at 19-20, then ordered an x-ray and ultrasound which were both unremarkable, *see* Ex. 4 at 3-5.

The nurse practitioner then ordered a December 26, 2018, MRI of Petitioner's right shoulder, which revealed a moderate grade articular sided partial-thickness tear of the supraspinatus, mild glenohumeral and acromioclavicular joint osteoarthritis, mild bicep tendinosis, and trace subacromial/subdeltoid bursal fluid. Ex. 4 at 6-7. On February 1, 2019, the same nurse practitioner recorded that Petitioner's right shoulder pain had "never resolved" and she had similar limitations. Ex. 3 at 6. The nurse practitioner referred her to an orthopedic surgeon. Ex. 3 at 6-10.

At the February 5, 2019, initial consult with the orthopedic surgeon, Dr. Stephan Sweet, Petitioner reported a chief complaint of right shoulder pain "after a flu shot" that was "present for 3 months, 1 week, and 5 days." Ex. 5 at 3. Petitioner reported that the pain occurred intermittently, specifically with activity and at night, but was rated at "10 out of 10" and interfered with activities of daily living ("ADLs"). *Id.* Active range of motion was recorded at 150° on forward flexion and abduction, 60° external rotation, and internal rotation to T8-T10. Id. at 4. There was no tenderness to palpation of her AC joint, bicipital groove, clavicle, or humerus. Id. Her right shoulder strength was 5-/5, and she had positive Hawkin's impingement, O'Brien's and Neer's tests. Id. Dr. Sweet assessed petitioner with a partial right rotator cuff tear. *Id.* at 5. He reviewed the options for treatment including pain medication, physical therapy ("PT"), and surgery. *Id.* at 5. Dr. Sweet also suggested steroid injections, but disclosed the risks including a "transient" rise in blood glucose. *Id.* Petitioner declined a steroid injection because she had diabetes mellitus and did not know the result of her last A1C reading. *Id.* at 6. She chose conservative management, acetaminophen for pain, and referral to PT. *Id.* at 5-6.

6

Upon starting PT on February 25, 2019, Petitioner reported that she had a right-sided "SIRVA injury" following the October 24, 2018, flu vaccine. Ex. 6 at 8. Attorney David Carney would be involved in her case "soon." *Id.* at 7. Petitioner further reported: "[T]here was a lot of bleeding from the injection and almost immediately she had bruising and after taking a brief nap, she woke up and had severe pain and immobility of her shoulder. She gave it a few weeks, thinking it would go away at some point, but around 3 weeks later she called her primary physician" (as summarized above). *Id.* at 15. As of February 2019, Petitioner was wearing a sling when she felt like her arm needed support, was icing sporadically, and applying heat "if it's really achy" in addition to ibuprofen to keep the inflammation and symptoms under control." *Id.* at 15. The therapist observed that Petitioner had "significant restriction of R shoulder mobility, strength, and function… although it is her non-dominant arm, she requires use of the RUE [right upper extremity] throughout the day which has continued to aggravate her symptoms and delay her improvement." *Id.* at 14. She would attend PT approximately twice a week for eight weeks. *Id.*

Over the PT course, Petitioner reported some gains such as being able to wash her hair without much pain, Ex. 6 at 30; Ex. 8 at 15; and doing a lot of cooking over one weekend, Ex. 8 at 17.

By the nineteenth (19th) and last PT session on May 2, 2019, Petitioner had "made slight progress with overall [range of motion], gaining nearly 30 degrees of flexion and 15 degrees of external rotation at 90 degrees of abduction in addition to full extension [range of motion]." Ex. 8 at 26. However, she "continued to have significant limitations in overall mobility" including on abduction, external and internal rotation, and flexion. She was "highly guarded with any [passive range of motion and manual techniques, making it difficult to progress mobility." *Id.* She had achieved only 20 – 40% of her functional goals (which concerned range of motion, strength, sleep, self-care, and work-related tasks). *Id.* The therapist recommended a repeat MRI to assess whether the rotator cuff tear had healed. *Id.*

At a May 6, 2019, follow-up, Dr. Sweet recorded that Petitioner rated her current pain at 10/10 and that she was "not responding well with physical therapy." Ex. 7 at 2. Dr. Sweet reviewed the treatment options again with Petitioner, who opted again for conservative management and acetaminophen for pain. *Id.* at 4. She again declined a steroid injection, citing her diabetes mellitus. *Id.* On May 29, 2019, Petitioner's A1c level was found to be 7.2% but she still declined a steroid injection. *Id.* at 6. At further appointments in November 2019 and early 2020, Petitioner had continued shoulder pain and limitations. She was doing home exercises but believed that resuming formal PT would be helpful. She had an upcoming appointment with her endocrinologist to optimize

7

management of her diabetes. Ex. 13 at 9-25. In September 2020, Petitioner reported changes in her Metformin dosage since the COVID-19 pandemic had interrupted her ability to exercise. Ex. 13 at 8. She was getting another A1C reading in 4-6 weeks. *Id.*

At the last encounter with Dr. Sweet filed into the record, on March 1, 2021, Petitioner reported continued pain with abduction and with overhead activities, which increased at night. Ex. 14 at 4. Dr. Sweet observed limited range of motion and a positive impingement sign. *Id.* at 5. Petitioner reported that her diabetes was less controlled, with an increased A1C of 8.5%; she would consider steroid injections and surgery when her A1C improved (under 7%). *Id.* at 7. Dr. Sweet advised regarding Petitioner's continued use of acetaminophen for pain and he prescribed a return to PT for 2 – 3 sessions a week for 12 weeks. *Id.* No further records have been filed.

Petitioner filed one affidavit, dated July 12, 2019, in which she recalls the vaccination as well as the onset, progression, and impact of her shoulder injury. Ex. 2.

### C. Factual Findings Regarding QAI Criteria for Table SIRVA

After a review of the entire record, I find that Petitioner has established, by a preponderance of the evidence, the QAI requirements for a Table SIRVA. I will address only the requirements disputed by the parties (and find petitioner has met the others even if not disputed).

#### 1. Site of Vaccine Administration and Site of Pain

Respondent conceded that the medical records establish that Petitioner experienced pain and reduced range of motion limited to her right shoulder. Rule 4(c) Report at 9. However, Respondent contended that there was not preponderant evidence that she received the October 24, 2018, flu vaccine in her injured right arm. *Id.*; Opp. at 2. Respondent emphasized that the vaccine administration record's handwritten superimposed "R" and "L" with regard to site. Opp. at 2 (citing Ex. 1 at 1; Ex. 12). Respondent correctly observes that neither letter is more clearly depicted than the other. Respondent also emphasized the fact that the administrative copy of the vaccine administration record's printed sticker reads: "Left arm," and that this record should be deemed accurate, especially since it can be plainly read. Opp. at 3 (citing Ex. 12 at 1).

Petitioner, however, argued that the Costco pharmacy's process for completing vaccine administration records is unknown, and that the sticker record may have been automatically generated, without specific input recording the actual site of administration.

Mot. at 14. She thus urged that I give more weight to her own recitation of situs than these records.

Based on the evidence before me, both parties' positions on this point approach speculation. However, I continue to find probative that in all *subsequent* records, starting less than three weeks later, Petitioner consistently reported that she received the vaccination in her right shoulder. The records also consistently document her significant pain and functional limitations in the right shoulder. *See, e.g.*, Ex. 3 at 6, 16; Ex. 5 at 3; Ex. 6 at 2, 15. Additionally, the physical therapy records provide that Petitioner is left-hand dominant, *see* Ex. 6 at 14. Based on my experience adjudicating many past SIRVA claims, it is reasonable to conclude that a vaccine will be generally administered in an individual's non-dominant arm. Based on all of the above, I find that it is more likely than not that Petitioner received the vaccination in her affected right arm.

### 2. Onset of Pain

A petitioner claiming SIRVA must also show that he or she experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)( XII)(A)), and that his or her pain began within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)).

Here, Respondent contended that there is not preponderant evidence of an appropriate onset because the records from the first two primary care encounters, within the first two weeks following vaccination, do not contain any reference to her shoulder. Rule 4(c) Report at 8-9 and Opp. at 3-4 (citing Ex. 3 at 21-27). I recognize that Petitioner did not address these encounters in her affidavit or briefing.

Respondent also maintains that Petitioner's telephone call to the primary care practice nineteen (19) days post-vaccination represented only her own claims, "unsubstantiated by medical records or medical opinion." Opp. at 9 (citing Ex. 9 at 2). To the contrary, Petitioner reported symptoms and asked about an in-person appointment, then a doctor provided an initial assessment, conservative treatment plan and an instruction to call back if Petitioner still wished a formal appointment. Petitioner may have initially acted cautiously in pursuing treatment, but her onset allegations are not contradicted by the later medical records.

In addition, Respondent proposes that the first primary care encounter that did address the right shoulder also included consideration of additional distinguishable health complaints. Thus, it is reasonable to assume that if Petitioner indeed had shoulder pain at the earlier encounters, she could have mentioned it and the providers would have

recorded it as well. Resp. Response at 4 (citing Ex. 3 at 16-20). This expectation for consistent record-keeping practices is less compelling, however, given that the four encounters were with four different individuals at the medical practice.

Based on these considerations and the subsequent medical records from several different providers which are consistent and not contradictory, I find that there is preponderant evidence that Petitioner's shoulder pain began within 48 hours after the flu vaccination on October 24, 2018.

### III. Damages

#### A. Legal Standards for Damages Awards

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[6] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

I have periodically provided statistical data on pain and suffering for SIRVA claims resolved in SPU. *See, e.g.*, *Accetta v. Sec'y of Health & Human Servs.*, No. 17-1731V, 2021 WL 1718202, at *2 (Fed. Cl. Spec. Mstr. March 31, 2021) (providing that as of January 1, 2021, in 47 SPU SIRVA cases that required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering ranged from $40,000.00 to $185,000.00).

## B. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of that injury to be considered. In assessing those factors, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both

---

[6] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the specific circumstances of this case.

With regard to duration, I find that Petitioner developed pain in her right shoulder within 48 hours after the October 24, 2018 vaccination, and limited range of motion within the first month. She still had "significant limitations" upon her PT discharge over six months into her course, in May 2019. Petitioner consistently reported ongoing pain and functional limitations for over two years after vaccination.

With regard to severity, Petitioner first reported her shoulder injury via telephone just nineteen (19) days after vaccination, but she also agreed to defer treatment and waited another seventeen (17) days before raising the injury during a formal appointment. She was discharged after nineteen (19) PT sessions in May 2019, then managed with a home exercise program and conservative treatment for at least half a year before her potential return to PT was delayed by the COVID-19 pandemic. Despite repeatedly rating her pain as moderate to severe and 10/10, she managed her pain via over-the-counter medication, ice, and reduced activity. She did not seek other interventions. Petitioner repeatedly cited her diabetes mellitus for declining surgery and cortisone injections, but the record only supports that the latter is associated with a risk of a "transient" rise in blood glucose and there was some delay in following up with her endocrinologist to optimize management of her diabetes. Overall, these facts offset her account that her ongoing pain was significantly severe and disruptive, *see* Ex. 2.[7]

Petitioner proposes that she should be awarded $95,000.00 because she has established past pain and suffering similar to what was awarded in several prior cases. Mot. at 20-22. Some are distinguishable. *Young*,[8] for example, involved a recurrence or exacerbation of shoulder pain approximately one year into the course after the petitioner received a second flu vaccination.[9] Similarly, in *Dhanoa*,[10] the petitioner received two

---

[7] I also recognize that throughout the course of her injury, Petitioner continued to work as an instructional assistant for school children with autism. However, she described – and the physical therapy records corroborate – that she was unable to perform certain responsibilities of her job. Petitioner also recalled that approximately two months into the course of her shoulder injury, she became the primary wage earner in her household.

[8] *Young v. Sec'y of Health & Human Servs.*, No. 15-1241V, 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019) (awarding $100,000.00 for past pain and suffering).

[9] The *Young* opinion recognized that the second flu vaccination was administered intranasally but was still followed "within days" by "a recurrence or exacerbation" of shoulder pain, loss of muscle mass, fatigue, and weakness. 2019 WL 396981, at *2-3 and n. 5.

[10] *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) ($85,000.00).

12

cortisone injections in addition to physical therapy. But I do find that *Weber*[11] and *Kent*[12] are helpful reference points to the extent that the petitioners therein had significant initial pain, treatment limited to physical therapy, and some continued pain and limitations after discharge. These damages decisions support an award slightly lower than Petitioner requests.

Respondent counters that an award of only $65,00.00 to $70,000.00 is warranted, because Petitioner "reported significant pain at onset but made a good recovery with limited treatment within a year or so of onset." Opp. at 10 (citing *Dagen*,[13] *Bartholomew*,[14] and *Tjaden*[15]). Petitioner correctly noted, however, that the injured parties in those cases were doing better overall, and had little to no pain or functional limitations one year from onset. In contrast, Petitioner herein was discharged from physical therapy six months after vaccination with ongoing pain and limitations, which she self-managed for another two years.

Ultimately, the parties' arguments frame what is the most equitable pain and suffering award under the circumstances. I thus **hereby award Petitioner $80,000.00 for past pain and suffering.**

C. **Unreimbursed Expenses**

Petitioner requested reimbursement of $1,064.82 for medical expenses. ECF No. 29 at 27-28, 31-41. Respondent agreed that most of the claimed expenses were fully documented and related to treatment of Petitioner's right shoulder. However, Respondent argued that the December 29, 2018 primary care encounter concerned Petitioner's vertigo, rather than her shoulder injury or her recent MRI. ECF No. 31-32 (citing Ex. 3 at 11; Mot. at 28).[16]

---

[11] *Weber v. Sec'y of Health & Human Servs.*, No. 17-399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. April 9, 2019) ($85,000.00).

[12] *Kent v. Sec'y of Health & Human Servs.*, No. 17-73V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) ($80,000.00).

[13] *Dagen v. Sec'y of Health & Human Servs.*, No. 18-442V, 2019 WL 7187335 Fed. Cl. Spec. Mstr. Nov. 6, 2019) ($65,000.00).

[14] *Bartholomew v. Sec'y of Health & Human Servs.*, No. 18-1570V, 2020 WL 3639805 (Fed. Cl. Spec. Mstr. June 5, 2020) ($67,000.00).

[15] *Tjaden v. Sec'y of Health & Human Servs.*, No. 19-419V, 2021 WL 837953 (Fed. Cl. Spec. Mstr. Jan. 25, 2021).

[16] Petitioner inadvertently overlooked this point, stating that "Respondent did not specifically comment on Petitioner's out of pocket medical expenses in [his] Response…" ECF No. 33 at 15.

Upon review, it appears that Petitioner's motion inadvertently cited to the December 29, 2018 encounter. But the record supports the conclusion that Petitioner did incur this sum in connection with her SIRVA, from the February 1, 2019 encounter when a primary care provider did in fact review the results of her MRI and evaluated authorization to see an orthopedist. Ex. 3 at 6. Therefore, Petitioner is awarded unreimbursed medical expenses in the full requested amount of $1,064.82.

## IV.  Conclusion

Based on the record as a whole and arguments of the parties, **I award Petitioner $81,064.82 in damages (representing $80,000.00 for past pain and suffering and $1,064.82 for past out-of-pocket expenses).**

This amount represents compensation for all damages that would be available under Section 15(a). The clerk of the court is directed to enter judgment in accordance with this decision.[17]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.